Christopher G. Renner (D.C. Bar No. 1025699)*
cgrenner@dhillonlaw.com
(571) 430-2240 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
*Additional Counsel on Signature Page*
    *   *pro hac vice* forthcoming

Brandon Q. Tran (CA Bar No. 223435)
btran@dhillonlaw.com
(949) 340-1968 (voice and fax)
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

***Attorneys for Plaintiff* The PLS.com, LLC**

**IN THE UNITED STATES DISTRICT COURT
FOR CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

| | |
|---|---|
| **The PLS.com, LLC**, a California limited liability company, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **The National Association of Realtors**, | |
| Defendant. | |

Plaintiff The PLS.com, LLC, ("PLS"), by and through its undersigned attorneys, brings this action for trebled compensatory damages under the antitrust laws of the United States against the above-named Defendant, demanding a trial by jury. For its Complaint against Defendant National Association of Realtors ("NAR"), PLS alleges the following:

## NATURE OF THE CASE

1.    For over 50 years, residential real estate in the United States has been primarily marketed through the multiple listing services ("MLSs") owned by members of the NAR.

2.    NAR, by itself and through its affiliates, controls competition in the residential real estate brokerage industry through its members' ownership of most of the nation's MLSs.

3.    NAR has frequently used its control over MLSs to exclude new and disruptive market entrants to the benefit of NAR members, and the detriment of consumers.  NAR and its members have abused the market power conferred upon them by control over the MLS system time and time again.

4.    NAR's ability to control competition in the residential real estate brokerage industry rests on the market power of the MLSs operated by its members.

5.    In recent years, the edifice on which NAR's ability to control competition was built had begun to crumble.  For the first time in the life of most Americans, an alternative to the NAR-affiliated MLS system had emerged, promising a wave of innovation, competition, and new entry.

6.    Home sellers have for years sought to retain the services of licensed real estate professionals to market their homes outside of the NAR-affiliated MLS system. Sellers sought these services for a number of reasons.  Many sellers desired for reasons of privacy or security to market their home without the wide exposure that comes from listing a property in NAR-affiliated MLSs.  Many sellers desired to test the market for their home without the stigma that comes from listing and then delisting the property on a NAR-affiliated MLS.

7.    Listings marketed by licensed real estate professionals outside the NAR-affiliated MLS system are sometimes called "pocket listings."  Demand for pocket listing services has skyrocketed in recent years, particularly in large and competitive real estate markets such as Los Angeles, Orange County, San Francisco, Miami, and

Washington D.C.  In some of these markets, 20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system, primarily as pocket listings.  NAR recognized in 2018 that NAR members were competing with one another to meet consumer demand for pocket listing services.

8.    As consumer demand for pocket listing service grew, so did the need for a centralized, searchable repository of pocket listings.  PLS was formed as the "Pocket Listing Service" to meet this need.  Pocket listings had historically been marketed bilaterally by licensed real estate professionals, face to face, through phone calls, or by email.  By joining PLS, licensed real estate professionals could privately share pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs.  For home sellers and the licensed real estate professionals serving those home sellers, the PLS offered all of the benefits of the NAR-affiliated MLSs while retaining the privacy and discretion that would be lost by listing with NAR-affiliated MLSs.  For home buyers and the licensed real estate professionals serving those home buyers, the PLS offered an opportunity to learn about properties that were not widely marketed.

9.    The surge in consumer demand for pocket listings, and the rise of a listing network to market pocket listings effectively, was a competitive threat to the viability of the NAR-affiliated MLS system.  These market changes also threatened NAR's ability to control competition in the residential real estate brokerage industry.

10.    NAR-affiliated MLSs were aware of this competitive threat.  Competing MLS systems met together privately and through NAR to discuss this threat and formulated a common plan to eliminate that competitive threat.

11.    In September 2019, the largest NAR-affiliated MLSs, including California Regional Multiple Listing Service, Bright MLS, as well as Midwest Real Estate Data, jointly authored and published a white paper on pocket listings and the future of the NAR-affiliated MLS system.  The white paper provided that "The multiple listing service as we know it is in jeopardy and this call-to-action serves as

an impassioned plea to brokers and MLSs to take immediate action." The white paper identified the declining share of properties listed in NAR-affiliated MLSs due to the "persistent, and increasing, presence of off-MLS home marketing" as among the "largest challenges MLSs face[.]" The white paper further noted the risk that one or more private listing networks would obtain a critical mass of pocket listings that "could fuel the trend to power private listing databases in general" which "will soon exceed, or circumvent, the service MLSs offer."

12.    PLS was the listing network that NAR-affiliated MLSs feared. Having amassed nearly 20,000 members, PLS had or would have soon attracted a critical mass of members and listings to create a powerful network effect that was likely to quickly lead to substantial market share as new members joined, bringing new listings, attracting in turn more new members and more new listings in a virtuous and self-sustaining cycle. The more competitive future that the NAR-affiliated MLSs feared had arrived.

13.    Acting through NAR, the NAR-affiliated MLSs moved swiftly to eliminate the competitive threat from listing networks aggregating pocket listings. In November 2019, NAR promulgated a mandatory rule governing all NAR-affiliated MLSs. The rule, called the Clear Cooperation Policy, requires NAR members participating in NAR-affiliated MLSs to submit their listings to the MLS within one business day of marketing the property to the public. For purposes of the Clear Cooperation Policy, NAR defines marketing a property to the public to include listing on private "multi-brokerage listing sharing networks" such as PLS. NAR members that violate the Clear Cooperation Policy face discipline and punishment by other NAR members.

14.    The Clear Cooperation Policy eliminates the viability of the private network of pocket listings that the MLS conspirators and other NAR-affiliated MLSs had identified as a competitive threat. By eliminating the threat to NAR-affiliated

MLSs, NAR cements its ability to control competition in the market for residential real estate brokerage services.

15.    Through the Clear Cooperation Policy, NAR and the MLS conspirators eliminated the possibility of a more competitive future in the market for residential real estate listing network services.  A once-in-a-lifetime opportunity for competition in a monopolized market has been lost.  NAR's conduct has harmed competition and consumers, and is illegal.

### PLAINTIFF

16.    Plaintiff PLS is a California Limited Liability Company headquartered in Los Angeles, California.  At the time the Clear Cooperation Policy was adopted, PLS operated the largest network of licensed real estate professionals marketing pocket listings in the United States.

### DEFENDANT

17.    Defendant NAR is a trade association headquartered in Chicago, Illinois, that establishes and enforces policies and professional standards for its over 1.4 million members.  NAR is incorporated under the laws of Illinois.  Its 54 state and territorial associations and over 1,200 local associations are members of, and are overseen by, NAR.  NAR promulgates rules governing the operation of the approximately 600 MLSs that are affiliated with NAR through their ownership or operation by NAR's state, local and territorial associations.  NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state.  It has more than 185,000 members in California, derives revenue from California, and holds meetings in California.  NAR also directs its California-based members to follow rules it promulgates.

### NON-PARTY CO-CONSPIRATORS

18.    California Regional Multiple Listing Service, Inc. ("CRMLS") is the largest MLS in the United States with over 100,000 members who have access to more than 70 percent of listings for sale in California.  CRMLS is owned and

controlled by NAR members operating through 39 local associations of NAR throughout the State of California. CRMLS is headquartered in Chino Hills, California, and is incorporated under the laws of California. CRMLS is a NAR-affiliated MLS governed and controlled by NAR rules.

19. Bright MLS, Inc. ("Bright MLS") is a MLS serving the Mid-Atlantic region of the United States with over 88,000 members. Bright MLS is owned and controlled by NAR members operating through 43 local associations of NAR members operating through local associations of NAR throughout the States of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia, the Commonwealth of Virginia, and the District of Columbia. Bright MLS is headquartered in Rockville, Maryland, and is incorporated under the laws of Delaware. In a typical year, Bright MLS will facilitate approximately $70 billion in residential real estate transactions. Bright MLS is a NAR-affiliated MLS governed and controlled by NAR rules.

20. Midwest Real Estate Data, LLC ("MRED") is a MLS serving northern Illinois, southern Wisconsin, and northwest Indiana with over 45,000 members. MRED is indirectly owned and controlled by NAR members operating through 15 local associations of NAR throughout the States of Illinois, Wisconsin, and Indiana. MRED is headquartered in Lisle, Illinois, and organized under the laws of Illinois.

## JURISDICTION, STANDING, AND VENUE

21. Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, arising from NAR's violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22. This Court has subject matter jurisdiction of Plaintiff's claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

23. Plaintiff has standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

24.    This Court has personal jurisdiction over Defendant and venue is proper in the Central District of California and this division under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because NAR and CRMLS regularly transact business within the Central District of California, and because Bright MLS and MRED formulated, led and joined a conspiracy among NAR members and NAR-affiliated MLSs that expressly aimed their intentional and anticompetitive conduct at California.    NAR and its co-conspirators knew and specifically intended that their conspiracy would be formulated, negotiated, and implemented in California, would exclude competition in California (where they knew PLS was based), and would harm consumers in California.    NAR and its co-conspirators worked in concert to effect NAR's adoption of the Clear Cooperation Policy at a 2019 NAR Convention in California, and NAR and its co-conspirators committed overt acts in furtherance of the conspiracy in California.    CRMLS, Bright MLS, and MRED  (together, the "MLS Conspirators") were among the MLSs that caused the September 2019 white paper, setting forth the competitive threat from pocket listings and the need for collective action among NAR-affiliated MLSs, to be published from San Juan Capistrano, California.

25.    NAR and the MLS Conspirators are engaged in, and their activities substantially affect, interstate trade and commerce.    Billions of dollars flow across state lines in the mortgage market to finance the sales of residential real estate facilitated by NAR and the MLS Conspirators.

**RESIDENTIAL REAL ESTATE BROKERAGE**

26.    State law regulates entry into the residential real estate brokerage services industry.    There are two licensee categories: (i) the real estate broker; and (ii) the individual real estate licensee or agent.    Brokers supervise agents who work directly with consumers.    Agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences.    Brokers

often provide agents with branding, advertising, and other services that help the agents complete transactions.

27.    Although there is no legal impediment to consumers buying and selling homes on their own, the large majority of consumers choose to work with a real estate broker. The substantial majority of residential real estate transactions involve the services of licensed real estate professionals. According to NAR, in 2017, 92 percent of sellers sold their home and 87 percent of buyers purchased their home with the assistance of a real estate broker.

28.    The vast majority of licensed real estate professionals active in the residential real estate brokerage services industry are NAR members.

29.    NAR promulgates rules and codes of conduct for its members and for its state, territorial and local associations. These associations, in turn, are required to adopt NAR's rules and bylaws and to enforce NAR-promulgated rules upon the licensed real estate professionals comprising the associations.

30.    Until recently, with the surge in consumer demand for pocket listings, NAR-affiliated MLSs facilitated the vast majority of residential real estate transactions.

31.    MLSs are joint ventures among virtually all licensed real estate professionals operating in local or regional areas. Licensed real estate professionals regard participation in their local MLS as critical to their ability to compete with other licensed real estate professionals for home sellers and buyers. The MLS combines its members' home listings information into a database, usually in electronic form. The MLS then makes these data available to all licensed real estate professionals who are members of the MLS. By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers. By searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs. An MLS is thus a market-wide joint venture of competitors that possesses substantial market

power: to compete successfully, a licensed real estate professional must be a member; and to be a member, a licensed real estate professional must adhere to any restrictions that the MLS imposes.

32.    The state, territorial and local associations of NAR (sometimes referred to as "Realtor® associations") own NAR-affiliated MLSs.  NAR requires each of these associations to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy.

33.    NAR does not require that licensed real estate professionals be NAR members to participate in NAR-affiliated MLSs.  In Alabama, California, Florida, and Georgia, NAR-affiliated MLSs are prohibited by law from promulgating any such requirement.  As a result, many licensed real estate professionals that are not NAR members participate in NAR-affiliated MLSs.

34.    NAR-affiliated MLSs must adopt new or amended NAR policies. NAR's Handbook on Multiple Listing Policy states that NAR-affiliated MLSs "must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

35.    One of the many benefits that NAR provides to its state, territorial and local associations and the MLSs owned by those associations is professional liability insurance.  To be eligible for this insurance, associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy.  NAR threatens to withhold these valuable insurance benefits from associations and MLSs that fail to comply with these mandatory provisions.  NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

36.    NAR reviews the governing documents of its state, territorial and local associations to ensure compliance with its rules.  NAR requires its state, territorial and local associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## THE NAR-AFFILIATED MLS SYSTEM

37.    For decades, the NAR-affiliated MLSs have often been regarded as a permanent, unavoidable, and inevitable feature of the residential real estate brokerage industry.  NAR-affiliated MLSs have for decades enjoyed durably high market shares in markets across the country.

38.    The majority of NAR-affiliated MLSs, including Bright MLS, are managed as for-profit enterprises.  Regardless of their corporate form, the majority of NAR-affiliated MLSs, and MRED, serve directly or indirectly as the primary revenue stream for their owners, the state, territorial and local associations of NAR, whose shareholders use the funds for other purposes.

39.    All NAR-affiliated MLSs are actual or potential competitors with other NAR-affiliated MLSs.  NAR-affiliated MLSs frequently have overlapping service areas and licensed real estate professionals may choose to pay for access to only one of several available NAR-affiliated MLSs.

40.    NAR-affiliated MLSs charge licensed real estate professionals for access to each MLS.  The prices charged by NAR-affiliated MLSs to licensed real estate professionals for access to the MLS are excessive, above competitive levels, and unrelated to the MLSs' cost of service.

41.    NAR-affiliated MLSs have been slow to innovate and unresponsive to consumer demand.  According to NAR-affiliated MLSs writing in 2019, "the software used in most MLSs has become obsolete."

42.    According to a white paper commissioned by NAR-affiliated MLSs in 2017, "Almost everyone interviewed for this study feels that the MLS industry has meandered aimlessly for over a decade.  There are of course various reasons, but the

dominant contributing factor is the fact that most MLS organizations are owned and governed by Realtor® associations.   And Realtor® associations, and their fragmentally managed committee structure, are simply not geared to compete in today's new, bold, fast-paced technology arena."

43.   A Chief Executive Officer of one NAR-affiliated MLS stated in 2017, "As an industry, we have outdated technology that is the result of the community we represent resisting change.  There are perhaps 30 to 40 MLSs across the country that have it right or are moving toward the right direction, but there are also 650 MLS organizations that are continuing to rest on how they have done it for decades. They are ignoring the fact that the marketplace and the needs of the user have changed, and their failure to respond is spiraling the MLS industry to the bottom."

44.   Another Chief Executive Officer of a NAR-affiliated MLS stated in 2017, "The MLS has a business model problem. The industry has forgotten who their customers are. The industry's longstanding 'product in a box' solution is no longer valid and the platform it is delivered on is antiquated.  In essence, the MLS is still trying to operate as a gatekeeper and continues to block real estate professionals from having access to the best-in-class products they need to help them do their job."

45.   The regionally-fragmented system of NAR-affiliated MLSs is inefficient and imposes unnecessary and redundant costs on licensed real estate professionals. According to an executive of a large real estate brokerage in 2017, "Mid-sized and large brokerages that operate across states and regions face unique challenges in having to belong to multiple MLSs, and that can be costly, redundant and inefficient." According to a 2015 study commissioned by NAR, "An estimated $250-$500 million in MLS fees are attributable to duplication, redundancy, and excess among MLSs every year.  If economies of scale were implemented nationwide, MLS fees would be significantly less."

46.   There is consumer demand for a listing network aggregating listings nationwide.  According to a 2015 study commissioned by NAR, "A national MLS has

been talked about for decades, but never before has the likelihood of it actually becoming a reality been so high."

47.    One driver of consumer demand for a national listing network service is attributable to large brokerages, which purchase listing network services nationwide. These brokerages can belong to dozens of MLSs across the country with often different rules, policies, technology and underlying systems.  In 2013, dozens of large brokerages threatened to pull out of NAR-affiliated MLSs and create their own multi-brokerage listing network, voicing concerns about MLSs overcharging for MLS services.

48.    Another driver of consumer demand for a national listing network service is attributable to brokerages that specialize in serving clients interested in listing properties that may be of interest to buyers nationwide, clients interested in considering the purchase of properties nationwide, or both.  These properties are sometimes relatively unique and have high listing prices.

**POCKET LISTINGS CREATE THE OPPORTUNITY FOR COMPETITION**

49.    MLSs, like other networks, exhibit what economists call "network externalities," meaning the value of the network services is a function of the number of trading partners connected by the network.

50.    The dominance of NAR-affiliated MLSs is a function of the percentage share of listings submitted to NAR-affiliated MLSs by licensed real estate professionals.  When all or almost all listings are submitted to the NAR-affiliated MLSs, the possibility of effective competition to those MLSs is nil.  Conversely, when listings are not submitted to the MLS and are marketed by licensed real estate professionals in other ways, the possibility of competition to the MLSs emerges.  And when a critical mass of listings becomes available for a competing listing network, the possibility of head-to-head, network-to-network competition becomes real.

51.    The dominance of NAR-affiliated MLSs is neither inevitable nor efficient.  The surge in consumer demand for pocket listings created, for the first time

in living memory, the possibility of competition for the NAR-affiliated MLSs.  Pocket listings presented the opportunity for a competing listing network to aggregate a critical mass of listings that could support a listing network competing with the NAR-affiliated MLSs.

52.    According to a 2015 study commissioned by NAR, "Off-MLS listings may contribute to the unraveling of the MLS as we know it, and its replacement by a private network that serves to benefit a certain group of participants."

53.    There is substantial and unmet demand among licensed real estate professionals, and among the customers they serve, for an alternative to the NAR-affiliated MLSs.

54.    According to a 2015 study commissioned by NAR, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end.  After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."

55.    According to the President and Chief Executive Officer of a network of large real estate brokerage firms in 2017, "MLS has been of great value to agents, but their loyalty to the MLS is waning … For the first time, the industry has entered a world where there are realistic and legitimate attempts to create alternatives to the MLS that exists today."

56.    As one licensed real estate professional wrote after the NAR Clear Cooperation Policy was adopted, "I long for the day when a private company decides to create an MLS platform that competes with association-owned MLSs freeing us from the clutches of NAR."

**PLS WAS A COMPETITIVE THREAT TO NAR'S MLS SYSTEM**

57.    PLS was formed in 2017 to address the demand of licensed real estate professionals, and for the consumers they serve, for an alternative to the NAR-affiliated MLS system.

58.    Like the NAR-affiliated MLSs, PLS is a private network limited to licensed real estate professionals.  All licensed real estate professionals were eligible to be members in the PLS.

59.    The PLS, like the NAR-affiliated MLSs, is a means for licensed real estate professionals to cooperate in the sale of residential real estate.  Like the NAR-affiliated MLSs, PLS operates an electronic database of listings submitted by PLS members with an offer of compensation to other PLS members that can find a buyer. Like the NAR-affiliated MLSs, PLS then makes these data available to all licensed real estate professionals who are members of the PLS.

60.    Unlike the NAR-affiliated MLSs, licensed real estate professionals listing on PLS could share as much or as little information about the listing as their client desired.  In this way, the PLS combined the powerful network efficiencies of the MLS with the privacy and discretion of the pocket listing.

61.    Before PLS was launched, there was no place for licensed real estate professionals operating in separate brokerage firms to privately list, search, organize and share information about pocket listings.

62.    PLS's fees to licensed real estate professionals would have been substantially lower than the fees charged for similar services to licensed real estate professionals by the NAR-affiliated MLSs.

63.    PLS was designed and marketed as a national platform, unlike the fragmented NAR-affiliated MLS system that imposes duplicative and burdensome fees on brokerages operating in multiple geographic markets.

64.    PLS was an actual or potential competitor to every single NAR-affiliated MLS, and each MLS Conspirator.  At the time the Clear Cooperation Policy was adopted, PLS had members across the country, including in the service areas of the MLS Conspirators.

65.    PLS launched successfully and grew quickly.  At the time the Clear Cooperation Policy was adopted, nearly 20,000 licensed real estate professionals were cooperating to sell billions of dollars of residential real estate listings nationwide.

66.    PLS was a serious competitive threat to the NAR-affiliated MLS system, and to the MLS Conspirators.

67.    NAR and the NAR-affiliated MLSs, and the MLS Conspirators, were aware of this competitive threat and acted through the Clear Cooperation Policy and otherwise to eliminate this threat.

### NAR AND ITS AFFILIATES EXCLUDE COMPETITION

68.    For the NAR-affiliated MLSs, pocket listings are a form of lost market share.  The NAR-affiliated MLSs were concerned that a critical mass of pocket listings could be aggregated in a competing listing network, making possible for the first time network-to-network competition to the MLS system.

69.    NAR-affiliated MLSs, and MRED, recognized that they could not unilaterally eliminate the competitive threat that pocket listings posed, in part because pocket listings are a national phenomenon and could create the possibility of a nationwide competitor to the MLS system.  NAR-affiliated MLSs, and MRED, recognized the need for collective action among NAR-affiliated MLSs, in the form of a change to the mandatory provisions in NAR's Handbook on Multiple Listing Policy that would require all NAR-affiliated MLSs to take action to stamp out the possibility of competitive entry presented by the rise of pocket listings.

70.    In August 2019, NAR's MLS Technology and Emerging Issues Advisory Board voted to recommend the adoption of what would become the Clear Cooperation Policy at the upcoming NAR Convention in San Francisco, California. The members present for this vote included executives of NAR-affiliated MLSs, and Defendant MRED.  On information and belief, MRED's representative participated in this NAR Advisory Board meeting as a representative of the Council of Multiple

Listing Services ("CMLS"), an association of approximately 200 MLSs, including NAR-affiliated MLSs and the MLS Conspirators.

71.     NAR admits that the Clear Cooperation Policy was formulated and advanced by the NAR-affiliated MLSs, and by MRED.  According to NAR, "The association's MLS Technology and Emerging Issues Advisory Board, a group made up of brokers and MLS executives, developed the proposal in consultation with brokerage and MLS leaders across the industry."

72.     NAR-affiliated MLSs around the country communicate frequently and privately among themselves regarding pocket listings, using internet forums and social media, and through CMLS.

73.     MRED's Chief Executive Officer admits that these private interfirm communications among NAR-affiliated MLSs, MRED, and the other MLS Conspirators, were the means by which the Clear Cooperation Policy was formulated and advanced.

74.     In September 2019, Bright MLS, MRED, and CRMLS were among the signatories of the white paper issued by the largest NAR-affiliated MLSs that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings.

75.     On October 16, 2019, Bright MLS adopted a version of what would become the Clear Cooperation Policy, before having any obligation under NAR rules or otherwise to do so.

76.     On or around the same day, MRED published a statement supporting adoption by NAR of the Clear Cooperation Policy at the upcoming NAR Convention.

77.     On October 17 and 18, 2019, NAR-affiliated MLSs, MRED, and the other MLS Conspirators, met at a CMLS conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take

action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy.

78.     On October 17, 2019, the Chief Executive Office of MRED addressed the assembled representatives of the NAR-affiliated MLSs at the CMLS conference. MRED's Chief Executive Officer, who had attended the August NAR meeting where the Clear Cooperation Policy was first proposed and recommended, explained that the Clear Cooperation Policy was motivated by concerns that pocket listings were "making the MLS less valuable."   At this October 2019 CMLS conference, representatives of the assembled NAR-affiliated MLSs were provided with copies of MRED's published statement in support of the Clear Cooperation Policy and urged to review it.

79.     On October 17, 2019, the Chairman of Bright MLS addressed representatives of the NAR-affiliated MLSs at the CMLS conference, recited the fact that Bright MLS the day before had adopted a policy banning pocket listings, and urged the assembled NAR-affiliated MLSs to adopt similar policies.   The Chairman of Bright MLS also urged the representatives of the NAR-affiliated MLSs to attend the upcoming NAR Convention, and to work as a group at that meeting to ensure NAR's adoption of the Clear Cooperation Policy.

80.     Among other things, the Chairman of Bright MLS stated "Now, the people who want to do pocket listings?  They're a little pissed.  They'll get over it. We need to not worry about it.  Because that's bad for our industry, right?  All right, let me tell you what we all need to do.  We have an opportunity in front of us to make, put this policy into effect in November.  And Bright adopted it yesterday, MRED's already adopted it, other people are already doing it, but we really need to get it through."

81.     The Chairman of Bright MLS continued on: "So what do we need to do? We need to go back and talk to your Boards of Directors, talk to your big brokers, and make sure that they understand we're talking pocket listings and not everything else

and make sure that they understand.  And then you need to make a policy statement. What are you guys going to do?  And then you need to come to that MLS forum, and you need to line up at the microphone and say 'Bright MLS, we're all in.  8.0.  Go.'" What would become the Clear Cooperation Policy was referred to at this time as MLS Statement 8.0.

82.    The Chairman of Bright MLS explained to the representatives of the assembled NAR-affiliated MLSs that he anticipated a degree of resistance to passage of the Clear Cooperation Policy at the upcoming NAR Convention, in part from NAR members who wished to continue to offer pocket listings.

83.    The Chairman of Bright MLS urged the representatives of the assembled MLSs to contact members of their MLS who were on NAR's Board of Directors to advocate for the adoption of the Clear Cooperation Policy at the upcoming NAR Convention.

84.    The Chairman of Bright MLS urged the representatives of the assembled NAR-affiliated MLSs to take collective action in the State of California to effect the adoption of the Clear Cooperation Policy.  Specifically, the Chairman of Bright MLS said "I look forward to seeing you in San Francisco.  I look forward to us, in this room, getting this through."

85.    In November 2019, NAR's and the MLS Conspirators gathered in San Francisco to take action on the Clear Cooperation Policy.  On November 9, 2019, NAR's Multiple Listing Issues and Policies Committee approved the Clear Cooperation Policy by a voice vote, sending the Policy to NAR's Board of Directors. Executives of the NAR-affiliated MLSs, including Bright MLS, and MRED, attended this meeting and spoke in support of the Clear Cooperation Policy.  As had been discussed and planned at the October CMLS conference, other NAR-affiliated MLSs did the same.  At this meeting, elimination of competition to NAR-affiliated MLSs from networks aggregating pocket listings was cited as a reason for passage of the Clear Cooperation Policy.

86.    NAR's Executive Committee reviewed and discussed the Clear Cooperation Policy at the San Francisco meeting on November 10, 2019.  NAR's Board of Directors approved the Clear Cooperation Policy at the San Francisco meeting on November 11, 2019.

87.    NAR adopted the Clear Cooperation Policy over the complaints of some NAR members, who informed NAR that the policy was anticompetitive and likely illegal.

88.    The text of the Clear Cooperation Policy provides:

Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. (Adopted 11/19).

89.    The Clear Cooperation Policy was effective January 1, 2020, and was included as a mandatory rule in the 2020 version of the NAR Handbook on Multiple Listing Policy.  NAR required that all NAR-affiliated MLSs, including Bright MLS and CRMLS, modify their rules to conform to the Clear Cooperation Policy by May 1, 2020.  NAR admits that all NAR-affiliated MLSs, including Bright MLS and CRMLS, must adopt and enforce the Clear Cooperation Policy.  According to NAR, "By establishing a national policy, it is mandatory that all REALTOR® Association MLSs adopt the policy and have the same consistent standard."

90.    NAR admits that there are no exceptions for properties that are "publicly marketed."  According to NAR, "The new policy does not include an 'opt out.' Any listing that is 'publicly marketed' must be filed with the service and provided to other MLS Participants for cooperation within (1) one business day."

91.    Previously, NAR-affiliated MLSs had generally allowed members to withhold listings from the MLS if the seller of the property so desired.  The Clear

Cooperation Policy eliminates this possibility, and in that way renders the provision of residential real estate brokerage services unresponsive to consumer demand.

92.    The Clear Cooperation Policy does, however, have an exception that allows brokerages to maintain so-called "office listings," or listings marketed entirely within a brokerage firm, without submission of those listing to the MLS.

93.    NAR-affiliated MLSs, including Bright MLS and CRMLS, enforce the Clear Cooperation Policy by monitoring adherence to the policy, encouraging MLS members to report their colleagues using pocket listings, and through fines for non-compliance.  For example, one MLS in South Florida, a market where consumer demand for pocket listings is high, describes the penalties it levies for violations of the Clear Cooperation Policy as "severe," including maximum fines of up to $15,000 and possible suspension or termination of access to the MLS.  The penalties imposed by the NAR-affiliated MLSs for violations of the Clear Cooperation Policy are intended to, and in fact do, make violations of the Clear Cooperation Policy cost-prohibitive for NAR members, and are a constructive refusal to offer MLS services to NAR members that violate the Clear Cooperation Policy.

94.    Since the adoption of the Clear Cooperation Policy, NAR-affiliated MLSs have operated, or planned to operate, their own private listing networks, effectively allowing their members to market off-MLS listings under the auspices of the NAR-affiliated MLSs without violation of the Clear Cooperation Rule.  MRED has also operated a private listing network.

95.    NAR-affiliated MLSs and CMLS have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS.

**RELEVANT MARKET**

96.    PLS and the NAR-affiliated MLSs, including Bright MLS and CRMLS, and MRED, compete to offer listing networks that facilitate the sale of residential real estate listings among licensed residential real estate professionals in the United States.

97.    The provision of listing network services to licensed real estate professionals for the sale of residential real estate listings is a relevant antitrust market.  Consumers of listing network services for the sale of residential real estate listings view these networks, including the NAR-affiliated MLSs, MRED and PLS, as substitutes for each other.  A hypothetical monopolist of listing network services for the sale of residential real estate listings could profitably impose a small but significant, non-transitory increase in price above competitive levels.

98.    Listing network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate.  No transaction between buyers and sellers occurs on these networks.  The networks simply list available residential real estate for sale and charges brokerages monthly fees to access the network, regardless of whether their agents represent buyers, sellers, or both.  Access to the listing network gives real estate agents the ability to list properties for sale or view available properties for sale.

99.    One relevant geographic market is nationwide.  Licensed real estate professionals and their customers seek listing network services that aggregate listings nationwide, from across the United States.  In the alternative, each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Conspirator, is a relevant geographic market.  On information and belief, each of the MLS Conspirators has enjoyed a durably high share of over 65 percent of residential real estate listings marketed by licensed real estate professionals in their respective service areas.

100.    NAR and the MLS Conspirators collectively have substantial market power in the relevant market or markets, however defined.  Substantial barriers to entry exist to protect that market power, as shown by the durably high market shares enjoyed by the NAR-affiliated MLSs and NAR's ability to exclude competition.  One substantial barrier to entry are the network effects that accrue to the NAR-affiliated MLSs as a result of their large market shares.  The value of an MLS to licensed real

estate professionals is a function of its market share.  The greater the market share, the larger the network effects that accrue to the MLS, and the more important access to the MLS is to licensed real estate professionals.  NAR and NAR-affiliated MLSs, including the MLS Conspirators, have the power to profitably elevate the prices paid by licensed real estate professionals for access to listing network services above the competitive level, and to impose onerous conditions of access on licensed real estate professionals, including the Clear Cooperation Policy.

## NAR'S UNLAWFUL CONDUCT

101.   NAR and the MLS Conspirators agreed with one another to exclude PLS. NAR and the MLS Conspirators had a conscious commitment to a common scheme to prevent the emergence of a viable competitor to NAR-affiliated MLSs, to exclude PLS from the relevant market, and to eliminate PLS as an effective competitor.  NAR and the MLS Conspirators took overt acts in furtherance of this conspiracy.

102.   NAR is a combination or conspiracy among its members, who are licensed real estate professionals who compete with one another.  The members of NAR, as a group and through the Board they elect and the staff they indirectly employ, have agreed to, adopted, maintained, and enforced rules, including the Clear Cooperation Policy, affecting how members compete to provide brokerage services, participate in NAR-affiliated MLSs, and access MLS services.  NAR's members agree (and adhere) to NAR's code of ethics, bylaws, and rules as a condition of membership.  NAR's rules, including the Clear Cooperation Policy, are therefore the product of agreements and concerted action among its members, including the owners of the NAR-affiliated MLSs. that operate and control the MLS Conspirators.

103.   The adoption and enforcement of the Clear Cooperation Policy by the NAR-affiliated MLSs is also the product of agreements and concerted action (i) among the MLS Conspirators and (ii) between and among each NAR-affiliated MLS and their members.  Each NAR-affiliated MLS is owned and controlled by associations of competing real estate brokers, who collectively have the power to

admit new members, propose bylaws, and enact rules for members. The NAR-affiliated MLSs' rules are an agreement among competitors that define the way in which they will compete with one another.

104. The Clear Cooperation Policy and the overt acts taken by NAR and NAR-affiliated MLSs in formulating, adopting, implementing, and enforcing that Policy, are unreasonable restraints of trade. Each of the MLS Conspirators joined the conspiracy to formulate and adopt the Clear Cooperation Policy for their own financial benefit and to eliminate the threat posed by upstart networks such as the PLS, and took overt acts in furtherance of that conspiracy.

105. The Clear Cooperation Policy imposes an "all or nothing" term on licensed real estate professionals that seek to use listing networks: the licensed real estate professional must either submit all such listings to the NAR-affiliated MLSs, or risk losing access to the NAR-affiliated MLSs.

106. The "all or nothing" term imposed on licensed real estate professionals by the Clear Cooperation Policy is exclusionary.

107. Because licensed real estate professionals generally believe that they must submit at least a portion of their listings to NAR-affiliated MLSs to serve their customers, the Clear Cooperation Policy predictably ensures that all listings are submitted to NAR-affiliated MLSs.

108. By ensuring that all listings are submitted to NAR-affiliated MLSs, the Clear Cooperation Policy eliminates the ability of listing networks that compete with the NAR-affiliated MLSs to feature listings that are not on the NAR-affiliated MLSs, and ensures that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network.

109. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy degrades the quality of competing listing networks, reduces the incentives of licensed real estate

professionals to use those competing listing networks, and makes those competing listing networks less effective competitors to the NAR-affiliated MLSs.

110.   By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy imposes a penalty on the use of competing listing networks and creates strong economic incentives for licensed real estate professionals to purchase listing network services exclusively from NAR-affiliated MLSs.   By ensuring that licensed real estate professionals accessing listings through a competing listing network pay twice for access to the same listings, the Clear Cooperation Policy creates strong economic incentives for licensed real estate professionals to exclusively use NAR-affiliated MLSs to avoid the surcharge imposed by the Clear Cooperation Policy on the use of competing listing networks.

111.   The Clear Cooperation Policy has had actual and substantial anticompetitive effects by eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS, or any other listing network, thereby harming competition in the market for the provision of listing network services to licensed real estate professionals.

112.   By eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS or any other listing network, the Clear Cooperation Policy forecloses competing listing networks from access to a critical mass of listings necessary to obtain significant network effects and compete with the NAR-affiliated MLSs in the relevant market(s).   All or nearly all active licensed real estate professionals depend upon access to NAR-affiliated MLSs.

113.   Through the Clear Cooperation Policy, NAR and the NAR-affiliated MLSs maintained the cost of listing network services for residential real estate listings above a competitive level, and otherwise stifled competition in the market for listing network services for residential real estate listings.   In that way, the conduct of NAR and the MLS Conspirators harmed (i) real estate professionals serving both buyers

and sellers of residential real estate services that desired to use listing networks other than those operated by the NAR-affiliated MLSs, and also (ii) those buyers and sellers of residential real estate.

114.   The Clear Cooperation Policy also harmed consumers and competition by eliminating from the market a form of real estate brokerage services desired by consumers, and which lowered barriers to entry for listing networks competing with the NAR-affiliated MLSs and MRED.  There was substantial consumer demand for pocket listings.   Before the Clear Cooperation Policy, licensed real estate professionals, including but not limited to NAR members, competed to offer pocket listings, and listing networks that competed with the NAR-affiliated MLSs and MRED were formed.  Through the Clear Cooperation Policy, NAR restrained the ability of licensed real estate professionals to offer those services.  Because NAR and its members collectively have market power, NAR's restraint on the ability of licensed real estate professionals to offer pocket listings has excluded competition in the relevant market(s), restricted output of residential real estate brokerage services and rendered the provision of those services unresponsive to consumer demand.

115.   There is no cognizable or plausible procompetitive justification for the unlawful conduct of NAR and the MLS Conspirators, or one that outweighs its anticompetitive effects.   NAR's tolerance of off-MLS listings when privately marketed by NAR members that do not compete with the NAR-affiliated MLSs as listing networks (the "office listing" exclusion) or under the auspices of NAR-affiliated MLSs shows that NAR's asserted justifications for the Clear Cooperation Policy are pretext, and illuminate the purpose and effect of the Clear Cooperation Policy as the elimination of competition to the NAR-affiliated MLSs in the relevant market(s) from PLS and other listing networks not affiliated with NAR.

116.   For nearly 60 years, NAR's Bylaws have recognized that forcing NAR members to list properties in the MLS in the routine provision of real estate brokerage services is improper and not reasonably related to any legitimate business

justification.  Since 1960, Interpretation No. 1 of Article 1, Section 2 of NAR's Bylaws has provided that "A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership.  When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it.   The decision, however, must be his own.   As a REALTOR®, it is possible for him to conduct business in an ethical and efficient manner without participating in a Multiple Listing Service.   Therefore, his participation must not be a requirement of REALTOR® membership."

117.  According to NAR's Handbook on Multiple Listing Policy, "Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership."

118.  The Clear Cooperation Policy does not eliminate or prevent any free-riding at the expense of NAR, NAR members, or the NAR-affiliated MLSs.  NAR does not itself provide MLS services.  NAR can and does charge membership fees, and can and does recoup the costs of providing its services in those fees.  The NAR-affiliated MLSs charge a membership fee for access to their listing networks, and can and do recoup the costs of providing listing network services in those fees.  The membership fees charged by the NAR-affiliated MLS do not generally vary depending on the number of listings submitted by NAR members to the MLS.  PLS members that sought to list properties on the PLS while also accessing a NAR-affiliated MLS were not free-riding on NAR members that only submit listings to NAR-affiliated MLS because PLS members that continued to also access the NAR-affiliated MLS continued to pay fees to the NAR-affiliated MLSs.  There were no

uncompensated services being provided by NAR, NAR members or NAR-affiliated MLSs to members of the PLS.  Instead, NAR and the MLS Conspirators advocated for and/or adopted the Clear Cooperation Policy as a means of preventing the continued exponential growth of a competitor that was providing a lower cost and nationwide listing service.

119.   The Clear Cooperation Policy is also overbroad and restrains competition unnecessarily.  The Clear Cooperation Policy was passed by NAR members but limits the ability of licensed real estate professionals who are not NAR members to compete using alternative listing network services because even non-NAR members generally depend upon access to the NAR-affiliated MLSs for at least some of their business.  NAR has no legitimate business justification for using NAR rules to restrain the ability of non-NAR members to deal with PLS and other listing networks that compete with the NAR-affiliated MLSs.  The overbreadth of the Clear Cooperation Policy illuminates its anticompetitive purpose and effect.

120.   PLS suffered injury and damages as a result of the unlawful conduct of NAR and the MLS Conspirators.  Adoption and implementation of the Clear Cooperation Policy had the natural and intended effect on PLS's business operations. Listings were removed from PLS and submitted instead to NAR-affiliated MLSs. Agent participation in PLS declined.  PLS's access to capital was constrained.  PLS was foreclosed from the commercial opportunities necessary to innovate and grow.

121.   Injury to PLS was the direct, foreseeable and intended result of NAR and MLS Conspirators' conduct.  The conduct of NAR and the MLS Conspirators simultaneously harmed PLS and consumers in the relevant market by excluding PLS and thereby artificially maintaining or increasing the prices paid by licensed real estate professionals for listing network services for the sale of residential real estate. Although the mechanism of injury to PLS and to licensed real estate professionals (and thereby to consumers) is the same, the damages caused by conduct of NAR and the MLS Conspirators in the form of higher prices is distinct from, and not duplicative

of, the damages caused to PLS, which take the form of lost profits and damaged equity and goodwill.

## UPDATED FACTUAL ALLEGATIONS

122.   PLS filed a Complaint in this Court in May 2020 naming as defendants NAR and the MLS Conspirators. *See The PLS.com, LLC v. The National Association of Realtors et al*, Case No. 2:20-cv-04790 ("*PLS I*"), ECF 1.  PLS filed an Amended Complaint in July 2020.  *Id.*, ECF 46.  The Amended Complaint was dismissed with prejudice for failure to state a claim upon which relief could be granted in February 2021.  *Id.*, ECF 97.  The Ninth Circuit reversed, holding that PLS's Amended Complaint stated a claim for relief under Section 1 of the Sherman Act.  *PLS.Com, LLC v. National Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022).

123.   On January 25, 2024, NAR and PLS entered into a Tolling Agreement and Stipulation.  The Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020, through the termination of the Tolling Agreement and Stipulation.  The Tolling Agreement and Stipulation had an expiration date of December 31, 2024.  A true and correct copy of the Tolling Agreement and Stipulation is attached hereto as Exhibit A.

124.   On January 26, 2024, PLS dismissed its claims against NAR without prejudice.  *See PLS I*, ECF 179.

125.   On February 2, 2024, PLS dismissed its claims against the MLS Conspirators with prejudice.  *See PLS I*, ECF 180.

126.   On March 14, 2025, but effective as of December 31, 2024, NAR and PLS entered into an Amendment to the Tolling Agreement and Stipulation.  The Amendment to the Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020 until June 30, 2025, unless earlier terminated by the parties.  A true and correct copy

of the Amendment to the Tolling Agreement and Stipulation is attached hereto as Exhibit B.

127.   Paragraphs 1-121 of this Complaint are substantively identical to the Amended Complaint filed by PLS in July 2020 (*PLS I*, ECF 46), with the omission of the MLS Conspirators as defendants and non-substantive changes to reflect that omission.

128.   NAR's Clear Cooperation Policy remains in effect as alleged herein and continues to have anticompetitive effects as alleged herein.

129.   NAR's Clear Cooperation Policy continued to have its natural and intended effect on PLS's business operations through August 2024, when PLS discontinued the provision of listing network services and exited the relevant market. At all relevant times, the Clear Cooperation Policy materially impaired PLS's business operations by preventing it from attracting a critical mass of listings sufficient to compete effectively in the relevant market for listing network services for the sale of residential real estate listings.  The Clear Cooperation Policy had a direct, material and adverse effect on PLS's business operations through August 2024 including diminished profits and diminished enterprise value and was throughout that time a material cause of injury to PLS's business and property.  PLS exited the relevant market as a direct result of the anticompetitive effects of the Clear Cooperation Policy.

**PLS'S CLAIM FOR RELIEF**

**COUNT ONE**

**(Violation of the Sherman Act)**

130.   PLS hereby restates Paragraphs 1 through 129 of this Complaint.  NAR's conduct as alleged herein is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.   NAR's conduct has caused injury and damage to PLS in the form of lost profits.

132.   NAR's conduct has caused injury and damage to PLS in the form of lost enterprise value, equity and goodwill, diminishing the value of PLS as a going concern.

## PRAYER FOR RELIEF

WHEREFORE, PLS respectfully prays for relief and judgment against NAR as follows:

1.   Award compensatory and trebled damages in favor of PLS and against NAR, including all interest thereon;

2.   Award PLS reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

3.   Any other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 1, 2025                    By:   /s/ *Christopher G. Renner*

Christopher G. Renner*
cgrenner@dhillonlaw.com
D.C. Bar No. 1025699
(571) 430-2240 (voice and fax)
Jonathan M. Shaw*
jshaw@dhillonlaw.com
Virginia Bar No. 98497
(703) 748-2266 (voice and fax)
Andrew K. Mann*
akmann@dhillonlaw.com
Virginia Bar No. 77021
(571) 695-2677 (voice and fax)
Domenic P. Aulisi*
daulisi@dhillonlaw.com
Virginia Bar No. 101045
(703) 574-1093 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

\*      *pro hac vice* forthcoming

By:    /s/ *Brandon Q. Tran*
    Brandon Q. Tran
    CA Bar No. 223435
    btran@dhillonlaw.com
    (949) 340-1968 (voice and fax)
    4675 MacArthur Court, Suite 1410
    Newport Beach, CA 92660

***Attorneys for Plaintiff* The PLS.com, LLC**